Electronically FILED by Superior Court of California, County of Los Angeles on 03/21/2019 10:12 AM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

Case 2:19-cv-03357-DSF-PLA   Document 1-2   Filed 04/25/19   Page 1 of 52   Page ID #:9

**Berman Litigation Group**
Laurence M. Berman (SBN 93515)
815 Moraga Drive
Los Angeles, CA 90049
Phone No.: (424) 465-9079
Fax No.: (310) 454-0868

Attorneys For Plaintiff Palumbo Design, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| PALUMBO DESIGN, LLC, a California limited liability corporation,<br><br>     Plaintiff,<br><br>     vs.<br><br>1169 HILLCREST, LLC, a Nevada limited liability corporation, NEM2 LLC, a Nevada limited liability corporation, NAM2, a Nevada limited liability corporation, Neil Moffitt, an individual, and DOES 1 through 10, inclusive,<br><br>     Defendants. | Case No.: 19STCV04949<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT; AND**<br>**(2) QUANTUM MERUIT** |

Plaintiff Palumbo Design, LLC, by and through its attorneys, brings this action against Defendant 1169 Hillcrest, LLC, a Nevada limited liability corporation, Defendant NEM2 LLC, a Nevada limited liability corporation, NAM2, a Nevada limited liability corporation and Defendant Neil Moffitt, an individual; and Does 1 through 10 (collectively all defendants are referred to as "Defendants").

**PARTIES**

1. Plaintiff Palumbo Design, LLC ("Palumbo Design" or "Plaintiff") is, and at all times relevant hereto was, a California limited liability company having its principal place of business in the County of Los Angeles, California.

2. Plaintiff is informed and believes, and based thereon alleges, that Defendant 1169 Hillcrest, LLC ("1169 Hillcrest"), is a limited liability company organized and existing pursuant to the laws of the State of Nevada having its principal place of business in the County of Los Angeles, State of California.

3. Plaintiff is informed and believes, and based thereon alleges, that the only member of 1169 Hillcrest is Defendant NEM2 LLC ("NEM2") or Defendant NAM2 LLC ("NAM2"), both of which are limited liability companies organized and existing pursuant to the laws of the State of Nevada, and having their principal place of business in the state of Nevada. (NEM2 and NAM2 shall be collectively referred to as "NEM2.")

4. Plaintiff is informed and believes, and based thereon alleges, that the only member of NEM2 is the Defendant Neil A. Moffitt ("Moffitt") who is an individual and resident of the State of Nevada.

5. In March of 2014, Plaintiff and 1169 Hillcrest entered into the Development Services Agreement ("DSA") for a property located at 1169 North Hillcrest Road (the "Property"). Under the DSA, Plaintiff was entitled to 40% of the Aggregate Development Fee as that term is defined in Schedule 5.1 of the DSA. Although an Aggregate Development Fee has been earned and Defendants are obligated to pay Plaintiff its share of the Aggregate Development Fee under the DSA, 1169 Hillcrest failed to do so and continues to refuse to do so despite repeated demand by Plaintiff. On information and

- 1 -

belief, the money received by 1169 Hillcrest from the sale of the Hillcrest Property that it agreed to pay to Palumbo Design as its share of the Aggregate Development Fee was transferred to NEM2, and then to Moffit. By virtue of Defendants NEM2's and Moffitt's wrongful retention of Plaintiff's share of the Aggregate Development Fee, Plaintiff is entitled to an order declaring that Defendants NEM2 and Moffitt hold said funds and any proceeds thereof and any other property acquired therewith as a constructive trustee for the benefit of Plaintiff, and should be compelled to convey these funds and any profits earned from these funds to Plaintiff.

6. Plaintiff is ignorant of the true names and capacities, of Defendants fictitiously designated herein as Does 1 through 10, inclusive, and therefore sues those Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this complaint when the true names and capacities of such fictitiously designated Defendants have been ascertained. Plaintiff is informed and believes and based thereon alleges that each fictitiously designated Defendant in some way as yet unknown to the Plaintiff is and was in some manner responsible for, or a party to, the disputes and other acts alleged herein.

7. Plaintiff is informed and believes and thereon alleges that each Defendant sued herein was the agent, principal, employee or representative of the other Defendants herein, participated in and/or ratified the acts complained of herein, provided knowing and substantial assistance to the other Defendants, or are in some way liable for the actions of each of the other defendants.

## **JURISDICTION AND VENUE**

8. Plaintiff is a resident of the County of Los Angeles, State of California. Defendant 1169 Hillcrest is a resident of the County of Los Angeles, State of California.

9. This Complaint asserts Plaintiff's rights under the Development Services Agreement ("DSA"). The DSA was entered into and performed in the County of Los Angeles, and the acts that provide a basis for the claims asserted in this complaint took place in Los Angeles County. Defendants purposefully availed themselves of the privilege of conducting business in California; each of the causes of action set forth in this

- 2 -

Complaint arise under California law. Accordingly, this Court has jurisdiction in this matter, in part, pursuant to Section 410.10 of the California Code of Civil Procedure, and Section 10 of Article VI of the California Constitution.

10. Venue is proper in Los Angeles County because Plaintiff is informed and believes, and thereon alleges, that Defendant 1169 Hillcrest contracted to perform certain obligations in Los Angeles County under the DSA. Accordingly, venue is proper in Los Angeles County under § 395 of the California Code of Civil Procedure.

## FACTUAL BACKGROUND

### The 1169 Hillcrest Property

11. There exists a certain parcel of real property located at 1169 North Hillcrest Road, Beverly Hills, CA 90210.

12. In late 2013, Michael Palumbo and real estate investor Richard Papalian ("Papalian") identified a lucrative real estate development opportunity to develop a parcel of vacant land in the heart of Beverly Hills located at 1169 North Hillcrest Road (the "Property").

13. Michael Palumbo is a well-known home designer and developer who has specialized in locating, designing and building homes in the "Platinum Triangle" area of Los Angeles, which includes Beverly Hills, Holmby Hills, and Bel Air, and in the Hollywood Hills for over thirty-five years.

14. In early 2014, Michael Palumbo and Papalian entered into a purchase agreement of $15,000,000 to purchase the Property with a $450,000 deposit.

15. Before the close of escrow, Michael Palumbo was approached by Moffitt. Moffitt wanted to purchase the Property and, together with Palumbo Design, develop the Property into a piece of luxury real estate. The developed Property is hereinafter referred to as the "Project."

### Moffitt and Palumbo Design Enter into a Memorandum of Understanding

16. On February 4, 2014 Michael Palumbo and Moffitt entered into a Memorandum of Understanding ("MoU") to memorialize their mutual understanding

- 3 -

1  regarding how to develop the Property.

2      17. Under the MoU, Michael Palumbo would transfer all his interests in the

3  Property to Moffitt in exchange for Moffitt's promise to form a new limited liability

4  company (the "Operating LLC") that would own and manage the Property to "develop

5  and sell an uber high end caliber home."

6      18. Once formed, the Operating LLC would buy out Papalian's interest in the

7  property by returning his $300,000 deposit and assume Palumbo Design's remaining

8  interest in the Property through an Assumption Agreement. As a result, the Operating

9  LLC would own the Property upon close of escrow.

10  **Moffitt Sends Michael Palumbo a "Development Services Agreement" Instead**

11  **of an LLC Operating Agreement**

12      19. Moffitt told Palumbo Design to expect a draft operating agreement for the

13  Operating LLC shortly. But, on or around March 14, 2014, Michael Palumbo was

14  surprised to receive a proposed Development Services Agreement instead.

15      20. This new agreement proposed a radically different relationship between

16  Palumbo Design and the Operating LLC.

17      21. The MoU contemplated that Palumbo Design and an entity controlled by

18  Moffitt would be co-members of the Operating LLC. Now, after reviewing the DSA (and

19  without any warning from Moffitt that this new structure was being proposed), Palumbo

20  understood that Moffitt was offering to have the Operating LLC *employ* Palumbo Design

21  as an *independent contractor*.

22      22. Palumbo Design was further surprised to learn that Moffitt intended the

23  Operating LLC (to be known as 1169 Hillcrest, LLC) to have only *one* member – NEM2.

24  Since NEM2 is an entity controlled by Moffitt himself, Moffitt alone would enjoy

25  membership rights in the Operating LLC.  A copy of the DSA is attached as Exhibit 1 to

26  this First Amended Complaint.

27  **The Structure of the DSA**

28      23. Under the DSA, Palumbo Design was paid a Development Service Fee. As

- 4 -

specified in paragraph 5 and Schedule 5.1 of the DSA, there are two components to the Palumbo Design's Development Service Fee. Paragraph 5 and Schedule 5.1 provide as follows:

5. DEVELOPMENT SERVICES FEE

5.1 Fee.

The Owner shall pay to Palumbo a fee, not to exceed the amounts provided in Schedule 5.1

SCHEDULE 5.1
Development Services Fee

1.     Commencing 30 days after Owner's purchase of the Property, the Owner shall pay a monthly draw in the amount of $15,000.00 per month to Palumbo (the "Monthly Draw"). The Monthly Draw shall continue until the cumulative Monthly Draws equal seven percent (7%) of the construction cost of the Project or until the sale of the Project and/or Property, whichever shall first occur. All Monthly Draws will be an advance of the aggregate development fee (the "Aggregate Development Fee").

2.     The Aggregate Development Fee shall be calculated as follows:

The Sales Price of the Project and/or Property

Less real estate broker Commission

Less out-of-pocket costs of sale of the Project and/or Property incurred by Owner

Less all cash payments made by the Owner to purchase, develop and construct the Project and/or Property (the "Owner Payments")

Less a preferential return of 10% on all Owner Payments

Less all payments of principal and interest in the event that Owner determines to obtain financing for the purchase, development and construction of the Project and/or Property, including all costs incurred by Owner in connection with obtaining such financing(s)

Equals Net Profits on sale of the Project and/or Property.

The Aggregate Development Fee shall be 40% of the Net Profits on Sale of the Project and/or Property.

The amount to be paid to Palumbo upon the sale of the Project and/or Property shall be:

The Aggregate Development Fee less the aggregate of all Monthly Draws upon the sale of the Project and/or Property.

24. Thus, under the DSA, Palumbo Design was provided with a monthly draw of

- 5 -

$15,000/month not to exceed 7% of total construction costs, and an "Aggregate Development Fee" equal to 40% share of the Project's net profits, net of certain costs, fees, and the return of capital to NEM2, together with a 10 percent preferred rate of return on that invested capital.

25. Paragraph 8 of the DSA entitled "TERMINATION" set forth the circumstances under which Defendant 1169 Hillcrest could terminate Palumbo Design, and also set forth Defendants' obligation to pay Palumbo Design in the event that Palumbo Design was terminated and when this payment is due. § 8.3 of the DSA entitled "Compensation of Palumbo on Termination," provides as follows:

> If Palumbo's appointment under this Agreement is terminated under Section 8.1, within 60 days after such termination, the Owner shall pay to Palumbo all amounts earned by (in accordance with Section 5.1) and owing to Palumbo under this Agreement (including any amount owing under Section 5.1), calculated as of the date of termination, including the Aggregate Development Fee less the aggregate of all Monthly Draws in the event this Agreement is terminated due to a sale of the Project and/or the Property. The right of Palumbo to receive the payments required to be paid under this Section 8.3 shall constitute the sole and exclusive remedy of Palumbo in the event that Palumbo's appointment is terminated under this Agreement. Palumbo hereby waives all other remedies available at law or in equity.

26. Thus, in the event that Palumbo Design was terminated, Defendants were obligated to pay Palumbo Design its share of the Aggregate Development Fee, calculated as of the date of termination, within 60 days after Palumbo Design's termination.

## Defendants Terminate Palumbo Design

27. On February 10, 2015, Defendants terminated Palumbo Design by writing an email that stated as follows:

> Mike,
>
> I trust this email finds you well? Further to our telephone conversation and subsequent email I would like to clarify matters regarding 1169 Hillcrest.
>
> As you know KAQ was very annoyed at the ongoing situation at 1201 Laurel Way that he believes was designed and developed by yourself. As I shared with you, amongst the many things that are wrong with the property, on a recent visit from his brother there were many issues with the property not limited to a land slip and lack of water which led to a very embarrassing situation for both he and I when his brother returned to Abu Dhabi. Clearly this was not what was expected when purchasing a 31 Million Dollar

1

2

3

> property.

> I shared with him your efforts at trying to correct the problems. Unfortunately those efforts were not successful.

> Turning now to the Hillcrest development it has not gone as expected. When you first asked for the investment you proposed a budget in the 30 Million range which escalated to 42 Million primarily because of your design. In addition to this those involved have zero comfort in the fact that even if this was approved you could achieve this number as both our own advisors and the contractor believe the costs will increase further.

> As I stated to you KAQ became so disenchanted by the combination of circumstances he no longer wanted his company to be involved in this project or with your future development efforts.

>  To avoid further embarrassment and annoyance, as well as to head off possible litigation, the Hillcrest Property was sold to an entity I control.

28. Defendants sold the Property to "Skyview Capital LLC", a third party unrelated to Defendants.

29. Palumbo gave Defendants notice that a "termination event" as defined by the DSA had taken place (the "Notice of Termination"). A copy of the Notice of Termination is attached hereto as Exhibit 2. Under the DSA, Defendants had seven days after receipt of the Notice of Termination to dispute that a Termination Event had taken place by following certain procedures set forth in the DSA. Defendants did not dispute Palumbo's determination that a Termination Event had taken place. As a result, Defendants have irrevocably admitted that a termination event has o

30. Palumbo Design sued 1169 Hillcrest LLC, NAM2 LLC and Moffitt in Federal District Court alleging fraud in the inducement, breach of contract, breach of the implied covenant of good faith, and unfair business practices. (*See* Case No.: 2:15-cv-01899-DSF.) In the alternative, Palumbo Design sought to rescind the DSA in its entirety. To protect its interest in the Property, Palumbo Design also filed a Notice of Lis Pendens shortly after filing this suit.

31. The procedural posture in which the District Court addressed Palumbo Design's complaint was on 1169 Hillcrest's Motion to Expunge the Lis Pendens. The court granted the motion, finding that Palumbo Design did not have an interest in the

- 7 -

Property. Critically, for purposes of the instant Complaint, the District Court summarized the gravamen of Palumbo's first amended complaint as follows: "Defendants concocted a pretext to renege of this development deal in order to flip the undeveloped Property, deflating Palumbo's profits while simultaneously extinguishing any agreement to employ Palumbo in this deal or others."

32. Palumbo Design's District Court action did not include a claim asserting that Palumbo Design was entitled to an Aggregate Development Fee, calculated as of the date of termination, and the sale of the Property had not taken place at the time that Palumbo Design's District Court action was filed.

33. Unlike in the Federal District Court litigation where Palumbo Design sued for fraud and rescission of the DSA, in this action, Palumbo Design is *affirming* its rights under Section 8 and Schedule 5.1 of the DSA and seeking Palumbo Design's share of the upon the sale of the Property.

**The Settlement Agreement in the Federal Court Action Between Plaintiff and Defendants**

34. 1169 Hillcrest, NAM2, and Moffitt entered into a Settlement Agreement with Palumbo Design on December 18, 2015 (the "Settlement Agreement"). The parties' Settlement Agreement explicitly affirms Palumbo Design's right to recover monies under the DSA stating as follows: "(b) The Parties further acknowledge that Palumbo is entitled to a 'Development Service Fee', as defined in Schedule 5.1 of the DSA, upon the sale of the Property by 1169 Hillcrest LLC to any other party, including Palumbo." A copy of the Settlement Agreement is attached as Exhibit 3 to this First Amended Complaint.

## <u>FIRST CAUSE OF ACTION</u>

### (Breach of Contract -

### Against All Defendants)

35. Plaintiff incorporates paragraphs 1 through 34 above as though fully set forth herein.

36. Plaintiff has performed, or been excused from performing, all or substantially

- 8 -

1   all of the obligations required of him under the DSA.

2       37. Defendants breached the DSA by failing to compensate Palumbo Design under

3   its express terms.

4       38. On or before February 10, 2015, Defendants terminated Palumbo Design under

5   the DSA. Palumbo Design gave Notice that a Termination Event has taken place.

6       39. 1169 Hillcrest LLC's termination of Palumbo Design and sale of the Property

7   by 1169 Hillcrest LLC were termination events under Section 8.1 of the DSA.

8       40. Section 8.3 of the DSA required Defendants to calculate all amounts owed

9   Palumbo Design *as of* the termination date, including Palumbo Design's share of the

10  Aggregate Development Fee.

11      41. Section 8.3 of the DSA further required Defendants to pay those amounts

12  within 60 days of the termination date.

13      42. As a result of Defendants' breach of the DSA, there is now due, owing and

14  unpaid to Plaintiff under the DSA an amount equal to 40% of Net Profits from the sale of

15  the Property plus interest at the maximum rate provided by law.

16      43. On information and belief, the money received by Defendant 1169 Hillcrest has

17  been transferred to Defendants NEM2 and Moffitt. By virtue of Defendants NEM2's and

18  Moffitt's wrongful retention of Palumbo Design's share of the Aggregate Development

19  Fee, Plaintiff is entitled to an order declaring that Defendants NEM2 and Moffitt hold said

20  funds and any proceeds thereof and any other property acquired therewith as a

21  constructive trustee for the benefit of Plaintiff, and should be compelled to convey these

22  monies or properties Plaintiff.

23                    **SECOND CAUSE OF ACTION**

24               **(Quantum Meruit Against All Defendants)**

25      44. Plaintiff incorporates paragraphs 1 through 43 above as though fully set forth

26  herein.

27      45. Starting in 2014, Plaintiff performed services in connection with the Property.

28      46. Defendants knew that such services were being provided to them by Plaintiff.

47. Plaintiff's involvement in the Property was of substantial benefit to the Defendants. The fair and reasonable value of the services provided by Plaintiff to the Defendants was in excess of $2,000,000.

48. Although Defendants have received substantial profit from the sale of the Hillcrest Property, they have refused to compensate Plaintiff for the reasonable value of his services. This unpaid amount plus interest at the maximum allowed by law on this amount is sought by Plaintiff.  Plaintiff will seek leave to amend this Complaint according to proof at the time of trial with respect to the total amount of damages and interest.

49. On information and belief, the money received by Defendant 1169 Hillcrest has been transferred to Defendants NEM2 and Moffitt. By virtue of Defendants NEM2 and Moffitt's wrongful retention of Palumbo Design's share of the Aggregate Development Fee, Plaintiff is entitled to an order declaring that Defendants NEM2 and Moffitt hold said funds and any proceeds thereof and any other property acquired therewith as a constructive trustee for the benefit of Plaintiff, and should be compelled to convey these monies or properties to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)      For compensatory damages for any and all economic loss, detriment and damage according to proof at trial, plus interest on this amount at the maximum rate allowed by law;

2)      For an order declaring that Defendants hold Plaintiff's interests in the monies obtained by them as constructive trustee for Plaintiff, for an order compelling them to convey to Plaintiff these monies, and, to the extent that all or portions of said monies have been transferred to third persons with no knowledge of their wrongful acquisition/retention of such funds and for valuable consideration ("Transferred Property"), for an order requiring Defendants to pay Plaintiff an amount equal to the value of said Transferred Property, plus interest thereon;

3)      For an order compelling Defendants to account for any monies improperly

- 10 -

obtained by them as alleged herein, and to pay the amount determined to be due Plaintiff pursuant to said accounting;

     4)    For disgorgement of any money and property by which Defendants unjustly enriched themselves as a result of their unlawful conduct as alleged herein;

     5)    For costs of suit incurred herein; and

     6)    For any such other and further relief as the Court may deem just and proper.

Dated: March 21, 2019          **Berman Litigation Group**

By: _____
Laurence M. Berman
Attorneys for Plaintiff Palumbo Design

- 11 -

# EXHIBIT 1

# DEVELOPMENT SERVICES AGREEMENT

This Development Services Agreement (this "Agreement") is entered into as of March ___, 2014 by:

**1169 HILLCREST, LLC,** a Nevada limited liability company (the "Owner"),

and

**PALUMBO DESIGN, LLC** a California limited liability company ("Palumbo").

## RECITALS

Whereas the Owner will purchase and own and upon purchase will develop certain real estate in Beverly Hills, California for the construction of an elite high-end residence (the "Project"); and

Whereas the Owner wishes to engage Palumbo to perform the Project Services (hereinafter defined) on the terms and conditions set forth in this Agreement;

Now, therefore, in consideration of their respective agreements in this Agreement, and for other valuable consideration, the adequacy and sufficiency of which the Owner and Palumbo hereby acknowledge, the Owner and Palumbo hereby agree as follows:

1.     DEFINITIONS AND CONSTRUCTION

    1.1.   Definitions.

As used in this Agreement, the following terms have the meanings given to them in this Section 1.1.

        (a)     "AAA" has the meaning set forth in Section 9.2.

        (b)     "Affiliate" of any party means any Person which, directly or indirectly, controls, is controlled by, or is under common control with, the party for which an affiliation is being determined

        (c)     "Agreement" has the meaning set forth in the preamble.

        (d)     "Approved Plans" means the plans and specifications for the Project, approved by the Owner, as modified by the Owner from time to time.

        (e)     "Arbitration" means the arbitration procedures provided in Section 9.

        (f)     "Architect" means the architect or architects engaged by the Owner in connection with the planning, programming, design and construction of the Project.

(g) "Bankruptcy Event" means the occurrence of any of the following events:

(1) Palumbo or the Owner making a general assignment for the benefit of its creditors;

(2) Palumbo or the Owner filing any petition or answer seeking any reorganization, liquidation, dissolution, adjustment or declaration of bankruptcy or insolvency or similar relief for itself under any present or future law relating to bankruptcy, insolvency or relief for debtors;

(3) a court of competent jurisdiction entering an order, judgment or decree approving a petition filed against Palumbo or the Owner seeking any such reorganization, liquidation, dissolution, adjustment, declaration or similar relief for Palumbo or the Owner, and the party that is the subject of such petition acquiescing in the entry of the order, judgment or decree or the order, judgment or decree remaining unvacated and unstayed for 30 days; or

(4) any trustee in bankruptcy, receiver, liquidator or any other officer with similar powers being appointed for Palumbo or the Owner or for all or any substantial part of its property and assets, and either Palumbo or the Owner consenting or acquiescing to such appointment or such appointment remaining unvacated and unstayed for a total of 90 days.

(h) "Bi-Monthly Progress Reports" means a report which shall include a comparison of actual expenditures to those provided for in the Budget, and a comparison of forecasted expenditures to those provided for in the Budget.

(i) "Budget" means, the development budget for the Project approved by the Owner, which budget shall be set forth in the form provided in Schedule 1.1(i).

(j) "Business Day" means any day other than a Saturday, Sunday or a statutory holiday in the United States.

(k) "Change of Control" shall be deemed to have occurred if:

(1) any Person or group of Persons acting in concert, other than Michael Palumbo acquires or becomes entitled to fifty percent (50%) or more of the combined voting power of the Persons entitled to elect the directors (or comparable positions) of Palumbo; or

(2) there is otherwise a change in the power, directly or indirectly, to direct or cause the direction of the management and policies of Palumbo, whether by contract or otherwise, and either alone or in conjunction with others.

(l) "Conceptual Budget and Schedule" means the conceptual budget and schedule for the Project that has been approved by the Owner as at the date of this Agreement, and is attached as Schedule 1.1(l).

(m) "Construction Loan" means any construction loan to be made to the Owner for the purpose of financing the costs of the Project.

(n)     "Consultant" means any Person (other than Palumbo) engaged by the Owner to provide architectural, engineering, design, structural, mechanical, electrical, landscaping, legal, marketing and sales, accounting or other consulting services in connection with the planning, approvals, programming, permitting, design, sales or marketing of the Project.

(o)     "Contingency Reserve" means the amount specifically designated in the Budget as a contingency or a reserve, including any amount reallocated to such contingency or reserve as approved by the Owner.

(p)     "Default" means any material breach or default under this Agreement, if such material breach or default continues uncured for a period of 30 days after the breaching or defaulting party receives written notice of the nature of such breach or default; provided, however, if such material breach or default can be cured but cannot, with diligence, be cured within such 30-day period, then such material breach or default shall not constitute a Default if the breaching or defaulting party shall promptly commence and at all times thereafter diligently pursue the cure of such material breach or default and such material breach or default shall be cured within 60 days after the breaching or defaulting party receives such notice.

(q)     "Development Approvals" means all approvals and permits from any federal, state, municipal or other governmental or regulatory authority required under applicable laws and regulations for the planning, programming, permitting, design, construction, development and use of the Project.

(r)     "Development Schedule" means the schedule for development of the Project approved by the Owner, and as may be amended from time to time by the Owner.

(s)     "Disbursement Account" means an account of the Owner into which the Owner shall deposit or transfer, in accordance with Section 3.5, any sums payable in connection with the Project Services.

(t)     "Expedited Arbitration" has the meaning set forth in Section 9.2.

(u)     "General Contractor" means the general contractor for the Project selected by Owner.

(v)     "Lender" means any party making Project Financing available to the Owner.

(w)     "Owner" has the meaning set forth in the preamble.

(x)     "Palumbo" has the meaning set forth in the preamble.

(y)     "Performance Standard" means the standard of performance maintained by Palumbo, which shall be in a manner consistent with the care, skill, prudence and diligence that a prudent Person acting in a like capacity and possessing expertise with respect to such matters would use in the conduct of an enterprise of like character and with like aims.

(z)     "Person" includes any individual, corporation, corporate body, partnership, limited partnership, limited liability company, joint venture, trust, estate, unincorporated association or other entity or any government or governmental or regulatory authority however designated or constituted.

(aa)     "Project Costs" means the actual costs incurred by Owner in connection with the Project, excluding (1) any expenditures the cost of which is covered by funds from a Contingency Reserve (whether through reallocation or otherwise), (2) any amount payable for a particular line item in excess of the amount provided for that item in the Approved Budget and (3) any costs incurred by Palumbo in providing Development Services.

(bb)     "Project Financing" means any loan, line of credit or other credit facility of the Owner that finances any Project Costs and any other fees, costs, expenses, indebtedness and other monetary obligations payable, incurred or assumed by the Owner in connection with the acquisition, planning, programming, permitting, design, construction and development of the Property.

(cc)     "Project Services" has the meaning set forth in Section 2.1.

(dd)     "Project" means the construction of an elite high-end residence on the Property in accordance with the Plans.

(ee)     "Property" means the real property and premises located at 1169 Hillcrest Road, Beverly Hills, California 90210.

(ff)     "Sale Proceeds" means the gross selling price of the Property.

(gg)     "Services Contractor" means any Person engaged by or on behalf of the Owner to perform services relating to the Project, including the provision of materials, supplies, machinery, plant, equipment, fixtures, furnishings, inventory or any other fixed property or chattels with respect to the Project, but Services Contractor does not include Palumbo, the General Contractor or Trade Contractors.

(hh)     "Termination Event" has the meaning set forth in Section 8.1.

(ii)     "Trade Contractor" means any person engaged directly by the General Contractor to perform construction relating to the Project, including the provision of materials, supplies, machinery, plant, equipment, fixtures, furnishings, inventory or any other fixed property or chattels with respect to the development and construction of the Project.

1.2.     Interpretation of Certain Terms.

(a)     Unless otherwise specified, all references to "Articles," "Sections," "subsections" and "Schedules" shall be deemed to refer to the designated articles, sections, subsections, schedules and other subdivisions of this Agreement;

(b)     The words "herein," "hereof' and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection, Schedule or other subdivision of this Agreement.

(c)     The word "including" shall not be construed to limit any general statement, term or matter to the specific item or matter set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to") is used in connection with such word, but rather shall be construed to refer to all other items or matters that could reasonably fall within the scope of such general statement, term or matter.

1.3.     Currency.

All references to currency are deemed to mean lawful money of the United States of America, and all amounts to be paid or calculated pursuant to this Agreement are to be paid or calculated in lawful money of the United States of America.

1.4.     Gender and Number.

As the context may require, as used in this Agreement, any singular term shall be deemed to include and refer to any plural version of such term; and any masculine term shall be deemed to include and refer to any feminine or neuter version of such term.

1.5.     Headings.

The division of this Agreement into articles and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

1.6.     Governing Law.

This Agreement shall be governed by, and construed in accordance with, the laws of California, without giving effect to that State's principles of conflicts of law.

1.7.     Schedules.

The following Schedules are attached to, and form part of, this Agreement:

| | |
|---|---|
| Schedule 1.1(i) | Form of Budget |
| Schedule 1.1(l) | Conceptual Budget and Schedule |
| Schedule 5.1 | Development Fee |
| Schedule 10.2 | Assignment and Assumption Agreement |

2.     APPOINTMENT OF PALUMBO

   2.1.    Appointment.

   The Owner hereby appoints Palumbo to manage and oversee the planning, approvals, programming, permitting, design, construction, and development of the Project (the "Project Services") and, in connection therewith, to perform the services hereinafter specified, on the terms and conditions set forth in this Agreement. Palumbo hereby accepts such appointment and hereby agrees to perform such services and its other duties and responsibilities under this Agreement, subject to, and in accordance with, the Performance Standard.

   2.2.    Development Sequencing.

   The Project shall be developed, as follows:

            (a)    Palumbo has prepared, and the Owner has approved, the Conceptual Budget and Schedule for the Project, as provided in Schedule 1.1(l). The Owner and Palumbo acknowledge that as the development process proceeds, Palumbo has prepared or shall prepare, for the Owner's approval, the Budget, and the Development Schedule for the Project; and

            (b)    prior to construction of any component of the Project, Palumbo shall be responsible to secure for the Owner all Development Approvals.

   2.3.    Effective Date.

   The effective date of this Agreement shall be the date first written above.

   2.4.    Reimbursement of Deposit Escrow.

   Upon Owner's purchase of the Property, Owner shall pay to Palumbo $150,000.00 to reimburse Palumbo for Palumbo's payment of the escrow deposit for the purchase of the Property.

   2.5.    Limitation on Authority.

   Palumbo shall have no right or authority under this Agreement, express or implied, to commit or otherwise obligate the Owner in any manner whatsoever except to the extent specified in this Agreement or specifically authorized in writing by the Owner.

   2.6.    Independent Contractor.

   Palumbo and the Owner expressly disclaim any intention to create a partnership or joint venture; nothing in this Agreement shall constitute Palumbo and the Owner as partners or joint venturers; and neither Palumbo nor the Owner shall assert, for any purpose, that a partnership or joint venture exists between them hereunder. The services to be performed by Palumbo under this Agreement shall be performed by Palumbo as an independent contractor and not as agent or in any other way as a representative of the Owner.

2.7.    Reliance on Owner's Representatives.

In all dealings with the Owner and in performing its duties, responsibilities and services under this Agreement, Palumbo shall be entitled to rely on any instruction, statement or approval from any authorized representative of the Owner from time to time. At Palumbo's request, the Owner shall provide to Palumbo a list of the Owner's authorized representatives and thereafter amend such list from time to time as necessary to reflect any changes in such authorized representatives.

3.    SERVICES

3.1.    Development Services.

Subject to the other terms of this Agreement, including the terms of Sections 2.4, 4.1 and 4.4, the Owner hereby authorizes Palumbo, and Palumbo hereby agrees, to perform the Project Services in accordance with the Performance Standard, including:

(a)    negotiating (for execution by the Owner) and managing and directing the performance of, all contracts between the Owner and all Consultants, Services Contractors and other third parties (other than Trade Contractors) with respect to the Project Services and coordinating the activities of such Consultants, Services Contractors and other third parties;

(b)    coordinating and managing the preparation of, and any changes to, required plans for the Project, including but not limited to: architectural and engineering plans, and after Palumbo is satisfied with the form and content of any and all such plans and specifications, submitting such plans and specifications to the Owner and causing such plans and specifications to be revised as required by the Owner until they are approved by the Owner and designated as the Approved Plans.

(c)    preparing the budgets for the development of the Project and submitting each budget to the Owner for its review and approval prior to the commencement of any predevelopment or construction activities on the Project;

(d)    preparing any amendments to the Budget and submitting each amendment to the Owner for its review and approval, prior to the expenditure of any amounts provided in such amendment;

(e)    on behalf of the Owner,

(1) applying for and pursuing all Development Approvals for the Project,

(2) negotiating and, subject to the approval of the Owner, concluding any required agreement with any governmental authority with respect to those Development Approvals, and

(3) managing and overseeing compliance with the terms and conditions of any such agreement and any Development Approvals;

(f) (1) preparing a proposed master schedule of the sequence and timing of basic decisions, design time, documentation, contract awards and construction activities required to develop and construct the Project,

(2) submitting such schedules to the Owner for approval and designation as the Development Schedule and

(3) revising and updating for the Owner's approval such Development Schedule as the planning, programming, approvals, permitting, design, construction and development proceeds;

(g) using commercially reasonable efforts to cause the Project Services to proceed in accordance with the Development Schedule, Development Approvals, and to proceed in accordance with the Development Approvals and the Plans;

(h) on behalf of the Owner, procuring and maintaining insurance coverage for the Owner, the Property and the Project in accordance with Section 3.6.

(i) monitoring the progress of the construction of the Project, and ensuring that the construction of the Project is being carried out in accordance with the Development Approvals, the Development Schedule, the Approved Plans and the Budget or, in the event construction is not being so carried out in any material respect, promptly notifying the appropriate Persons and the Owner, and overseeing the management and the development of the Project by:

(1) establishing and implementing appropriate administrative, financial and cost controls for the development of the Project and making suggestions or requests for specific design improvements, cost savings and efficiencies;

(2) identifying, in consultation with the Services Contractors, Consultants and/or Trade Contractors to participate in the construction of the Project, which Services Contractors, Consultants and/or Trade Contractors are reasonably experienced and qualified, with adequate capacity and resources, to carry out their duties and obligations in a timely manner, and, if applicable, preparing all required tender documents and reviewing all tenders;

(3) implementing, in accordance with this Agreement, any decisions of the Owner made in connection with the development and construction of the Project or any policies and procedures of the Owner relating to such development and construction and instructing the General Contractor where such decisions, policies or procedures relate to construction matters;

(4) obtaining and using commercially reasonable efforts to maintain in full force and effect all usual and normal warranties (excluding those provided by Trade Contractors) with respect to work done or materials supplied to the Owner in connection with the Project and coordinating and managing rectification of all deficiencies and administration of all warranties in accordance, where applicable, with the requirements of any new home warranty legislation;

(5)     (i)     if applicable, assist the Owner with obtaining Project Financing;

(i)     execute any documents reasonable requested by any Lender including, without limitation, an assignment of this Agreement; and

(ii)     preparing and submitting to the Owner periodic draw requests under the Project Financing containing such information as is required by the Owner or the Lender;

(6)     reviewing applications for payment submitted by the General Contractor, or any Services Contractor or Consultant and preparing documentation for all requests for payments from the Owner, in form and content sufficient to permit the Owner to determine the appropriateness of such payments;

(7)     preparing and submitting to the Owner (and any other parties designated by the Owner) the Bi-Monthly Progress Reports;

(8)     when appropriate, obtaining certification of substantial completion from the Architect stating that construction completion has occurred;

(9)     coordinating efforts by all appropriate parties to complete all warranty work and ensuring the quality of such warranty work;

(10)     promptly notifying the Owner of (i) any actual or anticipated material change in the Development Schedule of which Palumbo becomes aware, (ii) actual or anticipated material increases in the Budget of which Palumbo becomes aware, (iii) any material breaches or defaults under this Agreement of which Palumbo becomes aware, and (iv) any other circumstances of which Palumbo becomes aware which may materially impact the ability of the Owner to construct the Project in accordance, in all material respects, with the Budget, the Approved Plans, the Development Approvals and the Development Schedule;

(11)     assisting the Owner with respect to negotiations with all applicable utility companies, whether governmental or otherwise, for the installation of all applicable utility services to the Project on a timely basis, with the Owner bearing the cost of all required utility deposits and costs of installation; and

(12)     performing and administering any and all other services and responsibilities with respect to the Project which the Owner requests Palumbo to perform and which are within the general scope of the services described in this Section 3;

(j)     subject to the terms of Section 3.4, to the extent specified in the Budget and provided that funds are available from the Owner, and subject to the satisfactory review and approval by Palumbo and the Owner of all supporting documentation and applications for payments submitted by any vendor, paying the following amounts, on or before the date when such payments are due, for and on behalf of, and in the name of, the Owner:

(1)     any taxes, rates, levies, assessments and other impositions applicable to the Project or the Property;

(2)     any indebtedness and other obligations with respect to the Property or the Project, including:

Approvals;

(i)     any fee or other cost in connection with the Development

(ii)     any amount payable to the General Contractor, or any Services Contractor or Consultant and any other cost of labor or services in connection with the Project;

(iii)     the cost (including rental charges) of materials, supplies, plants and other landscaping materials, machinery, equipment, fixtures, furnishings, goods and other fixed property or tangible personal property acquired or used in connection with the Project; and

(iv)     sales taxes and other taxes (and, in conjunction with any such payment, applying for any available credit or rebate);

(3)     any fee, expense or other amount to which Palumbo is entitled pursuant to this Agreement; and

(4)     any other amount expressly contemplated in this Agreement;

3.2.     Information.

Palumbo shall provide the Owner, at reasonable times and subject to reasonable prior notice, complete and unfettered access to all information and records in the possession or control of Palumbo with respect to the Project and, by providing the Bi-Monthly Progress Reports and upon consultation upon request from time to time, shall keep the Owner fully informed on a regular basis of the progress of the planning, programming, permitting, design, construction and development of any work to be accomplished in connection with this Agreement.

3.3.     Employees.

Palumbo shall ensure that there are a  sufficient number of capable consultants and independent contractors to enable Palumbo to perform properly its duties and obligations under this Agreement in accordance with the Performance Standard. All such persons employed in the performance of its responsibilities hereunder shall be exclusively controlled by, and shall be the employees of, either the General Contractor or other consultant(s) and not by the Owner, and the Owner shall not have any liability, responsibility or authority with respect to such employment or control of such persons.

3.4.    No Requirement to Expend Money.

Palumbo shall not be required (and, without the consent of the Owner, shall have no authority) to expend or advance any of its own money on behalf of the Owner. Palumbo shall have no authority to incur on behalf of the Owner any liability, obligation, debt, cost, expense, claim or judgment in performing its services under this Agreement. In the event that, with the consent of the Owner, Palumbo does expend or advance any of its own money on behalf of the Owner, such expenses or advances shall be deposited by the Owner into the Disbursement Account for payment to Palumbo no later than 30 days after receipt by Owner of reasonable written supporting documentation.

3.5.    Accounts.

After approving disbursements of any sums payable in connection with the Project Services, the Owner shall disburse such sums directly to the Disbursement Account for further disbursement to the General Contractor, the Architect, Services Contractors or Consultants or for other Project Costs, or to the Owner at the Owner's request. Palumbo shall make withdrawals and disbursements from any Disbursement Account only upon the signature or signatures of individuals designated by Palumbo and approved by the Owner; provided, however, that the Owner shall have the right, at any time, to terminate Palumbo's signature authority over the Disbursement Accounts. The Owner shall select the financial institutions with which the Disbursement Accounts shall be maintained. All sums in Disbursement Accounts shall be and shall remain the property of the Owner. In the absence of a Default by Palumbo or an event that with notice and/or the lapse of time would constitute a Default by Palumbo, and if the Owner has not terminated Palumbo's signature authority over the Disbursement Accounts, Palumbo shall make disbursements from the Disbursement Account to pay the obligations of the Owner incurred in connection with the Project Services. Palumbo shall not commingle the Owner's funds with the funds of any other Person.

3.6.    Insurance.

During the term of this Agreement, unless otherwise agreed by Owner and Palumbo, Palumbo shall maintain, during the term of this Agreement and at least two (2) years beyond completion or termination of the work under this Agreement or completion of the Project, whichever is later, the following insurance:

(a)     Should Palumbo ever hire an employee, to the extent applicable to an employee of Palumbo, workers compensation insurance (statutory limits complying with law in the state of California) and employer's liability insurance with limits not less than $1,000,000 bodily injury by accident (each accident), $1,000,000 bodily injury by disease (policy limit), and $1,000,000 bodily injury by disease (each employee). Such policies shall cover both on-site and off-site activities and contain a waiver of subrogation in favor of Owner, and its partners, any subsidiaries or affiliates and any lenders.

(b)     Commercial general liability insurance for Palumbo's off-site activities, written on an occurrence policy form, with limits of not less than $5,000,000 for bodily injury and property damage per occurrence, and with deductibles or self-insured retentions acceptable

to Owner. All liability policies shall provide, without limitation, severability of interests (separation of insureds), contractual liability coverage (including coverage to the maximum extent possible for the indemnification obligations contained in the Agreement), broad form property damage coverage, elevator coverage, fire legal liability coverage, independent contractor coverage, cross- liability coverage and a duty to defend in addition to (without reducing) the limits of the policy(ies).

        (c)     Commercial automobile liability insurance covering owned, non-owned and hired automobiles, trucks and trailers, or semi-trailers, including any machinery or apparatus attached thereto, with limits not less than $1,000,000 combined single limit for bodily injury and property damage (each accident), and with deductibles or self-insured retentions acceptable to Owner.

Owner, any subsidiaries or affiliates designated by written notice from Owner to Palumbo and any lenders shall be named as additional insureds under the commercial general liability insurance policies. The coverage provided to the additional insureds shall be at least as broad as that provided to Palumbo and may not contain any additional exclusionary language or limitations applicable to the additional insureds.

All policies of insurance maintained by Palumbo shall be endorsed to be primary coverage, and any coverage carried by Owner shall be excess and non-contributory.

Upon request of the Owner, Palumbo shall deliver certificates of insurance evidencing the coverages required under this Agreement. All certificates of insurance must provide Owner with 30 days advance written notice of cancellation, intent to non-renew, or adverse material change in reduction of coverage.

All insurance maintained by Palumbo shall be obtained from insurance carriers qualified to do business in the state where the Project is located and having a rating of not less than A:X from A.M. Best & Co., unless Owner, in its sole discretion, gives written notice of its acceptance of a lower Best's rating.

None of the requirements contained in this Section 3.6 as to types, limits and approval of insurance coverage to be maintained by Palumbo are intended to, and shall not in any manner, limit or qualify the liabilities and obligations assumed by Palumbo under this Agreement or at law, including without limitation indemnification obligations and liability in excess of the limits of the coverages required under this Agreement. Neither receipt of certificates showing less or different coverage than so required, nor any other forbearance or omission by Owner shall be deemed a waiver of, or estoppel to assert, any right or obligation regarding the insurance requirements herein.

4.     GENERAL

     4.1.    Budget.

        (a)     Palumbo shall use commercially reasonable efforts to perform its duties, responsibilities and obligations under this Agreement in accordance with the Approved Budget. No deviation from any Budget is permitted without the prior written approval of the Owner.

(b)     Palumbo may incur expenditures of no more than $15,000.00 in the aggregate without obtaining the approval of the Owner in the event of an emergency where (i) the failure to immediately take appropriate steps to remedy the emergency would directly result in increased damage to the Project or endangerment of the Project, and (ii) it would be impossible or impractical to obtain the approval of the Owner for the expenditure prior to taking such appropriate steps to remedy the emergency. Palumbo shall notify the Owner as soon as practicable of any emergency and provide reasonable written supporting documentation of the expenditures incurred to remedy it.

(c)     In connection with the Bi-Monthly Progress Reports, or at any time upon request by either Palumbo or the Owner, acting reasonably, but with the intention of meeting no less frequently than once per month, Palumbo and the Owner shall meet to review the Budget in relation to the status of the Project and the Project Costs incurred to date. If Palumbo at any time determines that the Budget is not compatible with the then-prevailing status of the Project and does not adequately provide for the completion of the Project, Palumbo shall promptly prepare and submit to the Owner an appropriate revision of the Budget. Any such revision shall require the prior written approval of the Owner.

4.2.    Contract Documents.

Palumbo shall prepare and negotiate on behalf of the Owner, for execution by the Owner, any contracts with Consultants, Services Contractors and other third parties on reasonably competitive terms and conditions consistent with the Development Approvals, the Plan and the Budget then in effect with respect to the Project. All Approved Plans and contract documents shall remain the property of the Owner, to the extent not owned by the Architect.

4.3.    Transactions with Affiliated Entities.

Except where approved in advance by the Owner, Palumbo shall not propose to the Owner any contract, undertaking or transaction with any Affiliate of Palumbo relating to the Project (including contracts for the provision of supplies or services to that Project or the purchase, lease, license or other acquisition of property or assets to be utilized in connection with the Project). Palumbo shall disclose to the Owner its affiliation with any Services Contractor, Consultant or any other Person engaged in any manner in connection with the Project before proposing that the Owner engage such Services Contractor, Consultant or Person (either contractually, for bidding purposes or otherwise).

4.4.    Limitation of Liability of Palumbo.

Palumbo shall not be liable to the Owner for any act or omission made in good faith and in accordance with its obligations and within the scope of its authority under this Agreement, except to the extent that such act or omission constitutes a Default by Palumbo, negligence or willful misconduct of Palumbo or an unlawful act of Palumbo or any Person for whom, by law, Palumbo is responsible. Without limiting the generality of the foregoing provision, Palumbo shall not be liable to the Owner for any cost overruns, delays, design defects, construction defects or other damage or expense arising out of acts, errors or omissions of the Services Contractors or Consultants, except to the extent arising out of a Default by Palumbo, negligence

or willful misconduct of Palumbo, or an unlawful act of Palumbo or any Person for whom, by law, Palumbo is responsible.

5.    DEVELOPMENT SERVICES FEE

    5.1.    Fee.

The Owner shall pay to Palumbo a fee, not to exceed the amounts provided in Schedule 5.1

6.    REPORTING AND ACCOUNTING

    6.1.    Reporting Requirements.

By the tenth (10th) day and the twenty-fifth (25th) day of each calendar month during the occurrence of the Project Services, Palumbo shall prepare and deliver to the Owner (and to such other parties identified by the Owner) the Bi-Monthly Progress Reports. Concurrently with delivery of any Bi-Monthly Progress Report, costs actually expended as of the date of the Bi-Monthly Progress Report shall be certified by Palumbo as being true, complete and correct. Notwithstanding the foregoing, all financial information (such as financial statements) delivered in connection herewith shall be prepared by Palumbo in accordance with generally accepted accounting principles and shall be delivered each month no later than the earlier of (a) ten (10) days following a Construction Loan draw request submitted with respect to that phase of the Project, and (b) the tenth (10th) day and the twenty-fifth (25th) day of such month, as applicable.

    6.2.    Palumbo's Books and Records.

Palumbo shall provide the Owner with any accounting and financial information and supporting documents relating to Project Costs in the possession or control of or available to Palumbo that such Person reasonably requests, but the such Persons shall be entitled only to such information in a form readily available to Palumbo, and Palumbo shall not be required to organize or present such information in any other form or to analyze, summarize or otherwise report on such information.

    6.3.    Owner's Books and Records.

The Owner shall provide Palumbo with any accounting and financial information and supporting documents relating to the Project Services in the possession or control of the Owner that Palumbo reasonably requests, but Palumbo shall be entitled only to such information in a form readily available to the Owner, and the Owner shall not be required to organize or present such information in any other form or to analyze, summarize or otherwise report on such information.

    6.4.    Access to Books and Records.

The Owner shall permit Palumbo, and Palumbo shall permit the Owner to have reasonable access to examine and copy during reasonable business hours their books and records

pertaining to the Project Services or any other matter relating to this Agreement, at the expense of the party so examining and copying.

7.    COVENANTS OF THE OWNER

    7.1.    Covenants of the Owner.

    Provided Palumbo shall not be in Default hereunder, the Owner shall:

    (a)    pay on or before the due date all amounts payable by the Owner to Palumbo pursuant to, or as contemplated by, this Agreement;

    (b)    give prompt consideration to all things relating to the Project Services reasonably presented by Palumbo to the Owner for consideration, approval or other action, and inform Palumbo of any comments, approvals or decisions of the Owner within a reasonable time, but in the event that any such approval is not granted by Owner within seven (7) days of the request, such request shall be deemed disapproved;

    (c)    arrange for reasonable access to the Property and the Project by Palumbo at all times to enable Palumbo to perform its services hereunder; and

    (d)    give prompt written notice to Palumbo whenever the Owner identifies any matter relating to the Project or the Property that the Owner reasonably determines would be material to Palumbo in the performance of its services hereunder.

    7.2.    Indemnities.

    (a)    Palumbo shall indemnify, defend and hold harmless the Owner and its shareholders, directors, partners, members, managers, officers and employees from and against any claim, demand, action, lawsuit, proceeding, damages, loss, liability, judgment or award, and any cost or expense (including court costs, reasonable fees and expenses of attorneys, consultants and expert witnesses, and other reasonable costs and expenses incurred in investigating, preparing for, or defending against any such claim, demand, action, lawsuit or proceeding), related to this Agreement or the performance by Palumbo of its services under this Agreement, but only to the extent arising out of the negligence or willful misconduct of Palumbo, or a Default by Palumbo, or an unlawful act of Palumbo or any other Person for whom, by law, Palumbo is legally responsible.

    (b)    The Owner shall indemnify, defend and hold harmless Palumbo and its shareholders, directors, partners, members, managers, officers and employees from and against any claim, demand, action, lawsuit, proceeding, damages, loss, liability, judgment or award, and any cost or expense (including court costs, reasonable fees and expenses of attorneys, consultants and expert witnesses, and other reasonable costs and expenses incurred in investigating, preparing for, or defending against any such claim, demand, action, lawsuit or proceeding), related to this Agreement, the appointment of Palumbo under this Agreement or the performance by Palumbo of its services under this Agreement, but only to the extent arising out of the negligence or willful misconduct of the Owner, or a Default by the Owner, or an unlawful act of the Owner or any other Person for whom, by law, the Owner is legally responsible.

*LV 420197324v3*

7.3.   Survival

The provisions of this Section 7 shall survive the completion of Palumbo's services hereunder or any termination of this Agreement.

8.   TERMINATION

8.1.   Termination.

Palumbo's appointment hereunder may be terminated at any time by written agreement between the Owner and Palumbo or upon the occurrence of any of the following events (each, a "Termination Event"):

(a)   by Palumbo giving the Owner written notice of such termination, in the event of a Default by the Owner or a Bankruptcy Event with respect to the Owner; or

(b)   by the Owner giving Palumbo written notice of such termination, in the event (1) of a Default by Palumbo, (2) of a Change of Control of Palumbo, (3) of a Bankruptcy Event with respect to Palumbo, (4) that Palumbo misappropriates any funds of the Owner in the possession or control of Palumbo, (5) that Palumbo commits criminal conduct, willful misconduct, gross negligence or an act of fraud against the Owner or (6) the Project and/or the Property is sold by the Owner.  In the event of the termination of this Agreement under this Section 8.1(b), with respect to any part of the Project as to which construction has commenced as of the date of such termination, upon request of the Company, Palumbo shall continue the development services and other duties hereunder with regard to such part of the Project pursuant to this Agreement (and payment for such services shall continue as set forth in this Agreement) and such termination shall be effective upon the date as may be designated by the Owner).

8.2.   Duties Upon Termination.

(a)   Upon termination of Palumbo's appointment under this Agreement in accordance with Section 8.1, Palumbo shall promptly deliver the following to the Owner or in accordance with the directions of the Owner:

(1)   any funds of the Owner held by Palumbo, whether received by Palumbo before or after such termination (and Palumbo shall take all steps necessary to transfer any accounts); and

(2)   all material documents pertaining to the Project and in existence at the date of termination, including all books of account, bank books, correspondence, plans, permits, market studies, surveys, tests and contracts, but Palumbo shall be entitled, for a period of three (3) years thereafter, to inspect, examine and copy any such documents at any reasonable time upon ten days of advance notice to the Owner.

(b)   Palumbo shall cooperate with the Owner as the Owner shall reasonably require in order to effectuate an orderly and systematic termination of Palumbo's duties and responsibilities under this Agreement and orderly and systematic transfer of duties to Palumbo's successor. This Section 8.2 shall survive any termination of this Agreement.

8.3.   Compensation of Palumbo on Termination.

If Palumbo's appointment under this Agreement is terminated under Section 8.1, within 60 days after such termination, the Owner shall pay to Palumbo all amounts earned by (in accordance with Section 5.1) and owing to Palumbo under this Agreement (including any amount owing under Section 5.1), calculated as of the date of termination, including the Aggregate Development Fee less the aggregate of all Monthly Draws in the event this Agreement is terminated due to a sale of the Project and/or the Property. The right of Palumbo to receive the payments required to be paid under this Section 8.3 shall constitute the sole and exclusive remedy of Palumbo in the event that Palumbo's appointment is terminated under this Agreement. Palumbo hereby waives all other remedies available at law or in equity.

8.4.   Determination of Termination Event.

If either party to this Agreement shall make a claim that a Termination Event has occurred, such party shall provide written notice of such claim to the other party, and, if applicable, the Lender. Such notice shall identify the Termination Event and shall include the following statement set forth in capital letters: "THIS NOTICE SHALL CONSTITUTE WRITTEN NOTICE OF OUR DETERMINATION THAT A "TERMINATION EVENT" HAS OCCURRED UNDER THE DEVELOPMENT SERVICES AGREEMENT DATED AS OF MARCH __, 2014 AMONG THE OWNER AND PALUMBO. IF YOU DISPUTE WHETHER A TERMINATION EVENT HAS OCCURRED, YOU MUST SUBMIT SUCH DISPUTE TO "ARBITRATION" IN ACCORDANCE WITH THE TERMS OF SAID DEVELOPMENT SERVICES AGREEMENT WITHIN SEVEN DAYS OF RECEIPT OF THIS WRITTEN NOTICE. YOUR FAILURE TO SUBMIT SUCH DISPUTE TO ARBITRATION WITHIN SUCH SEVEN-DAY PERIOD SHALL CONSTITUTE AN IRREVOCABLE, BINDING ADMISSION BY YOU THAT A TERMINATION EVENT HAS OCCURRED." Any party to this Agreement receiving a notice of the occurrence of a Termination Event in accordance with the terms of this Section 8.4 shall have the right to dispute whether a Termination Event has occurred only by submitting such dispute to arbitration within seven days of receipt of such notice. Failure to submit such dispute to arbitration within such seven-day period shall be deemed to constitute an irrevocable, binding admission that a Termination Event has occurred. Any contrary provision of this Agreement notwithstanding, if a dispute as to whether a Termination Event has occurred is properly submitted to arbitration within such seven-day period, no party to this Agreement shall have the right to take any actions or exercise any rights or remedies on account of such alleged Termination Event, and Palumbo's appointment under this Agreement shall not be terminated, unless and until there has been a determination pursuant to arbitration that a Termination Event has occurred.

9.   ARBITRATION

9.1.   Arbitration.

The determination of whether or not a Termination Event has occurred shall be referred to and shall be settled by arbitration in accordance with the provisions of Section 9.2.

9.2.    Arbitration Procedure.

Notwithstanding anything to the contrary contained in this Agreement or in the Expedited Procedures provisions (Rules E-I through E-10 in the current edition) of the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), the parties hereto acknowledge and agree that all disputes (regardless of any dollar amount in dispute) with respect to whether a Termination Event has occurred under this Agreement shall be submitted to binding arbitration ("Expedited Arbitration") under the AAA Expedited Procedures. In cases where Expedited Arbitration shall be utilized: (i) the party submitting the dispute to the AAA for Expedited Arbitration must file a demand for Expedited Arbitration with the AAA within the seven (7) day period required by Section 8.4, and the party making such demand shall deliver a copy of such demand to the other parties hereto pursuant to Section 10.7, (ii) the parties shall have no right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Rule E-5, (iii) as a condition to accepting appointment, the arbitrator must agree to render a determination within twenty (20) days of the date of the first hearing is deemed closed by the arbitrator, (iv) the first hearing shall be held within seven (7) days after confirmation of the appointment of the arbitrator, (v) the arbitrator's determination shall be binding upon the parties, (vi) the losing party in such arbitration shall pay the arbitration costs charged by AAA and the arbitrator's fees, and (vii) the sole issue to be decided shall be whether a Termination Event has occurred, and, if there is a determination that a Termination Event has occurred, there shall be no determination as to the amount of damages incurred as a result of such Termination Event (any determination of damages shall be made by a court of competent jurisdiction).

10.    MISCELLANEOUS

10.1.    Assignment/Delegation by Palumbo.

(a)    Palumbo shall not assign any of its rights or obligations under this Agreement to any Person without the prior written consent of the Owner, which consent may be granted or withheld by the Owner in its sole and absolute discretion, Any such assignment by Palumbo shall not release or discharge Palumbo from the performance of its covenants in, or obligations under, this Agreement unless, and only to the extent that, the Owner delivers to Palumbo a written instrument confirming such release or discharge.

(b)    Palumbo may delegate any duties arising under this Agreement, or subcontract for the performance of any of its services under this Agreement, to any Affiliate, without the consent of the Owner, but no such delegation or subcontracting shall relieve Palumbo from any of its obligations under the Agreement, and Palumbo shall be responsible to compensate such Affiliate from the fee payable to Palumbo pursuant to Section 5.1.

10.2.    Assignment of Property Documents.

Concurrently with the execution of this Agreement by each party hereto, Palumbo shall cause Michael Palumbo to assign all right, title and interest, free and clear of any encumbrance, claim, lien or charge of any kind, to the Owner to the following agreements and documents in the form set forth in Schedule 10.2:

(a)     the Purchase Agreement;

(b)     Statewide Buyer and Seller Advisory dated February 17, 2014;

(c)     Disclosure Regarding Real Estate Agency Relationship dated February 4, 2014;

(d)     Seller Vacant Land Questionnaire dated February 17, 2014;

(e)     Residential Earthquake Hazards Report dated February 18, 2014;

(f)     Lead-based Paint and Lead-based Paint Hazards Disclosure, Acknowledgment and Addendum dated February 4, 2014;

(g)     Carbon Monoxide Detection Notice dated February 18, 2014;

(h)     Market Conditions Advisory dated February 17, 2014;

(i)     Disclosure Addendum dated February 22, 2014;

(j)     Disclosure and Consent for Representation of More than One Buyer or Seller dated February 4, 2014;

(k)     Buyer Inspection Waiver dated February 22, 2014;

(l)     Agent Visual Inspection Disclosure dated February 20, 2014;

(m)     Preliminary Title Report prepared by American Title;

(n)     Escrow Instructions dated February 19, 2014 as amended February 20, 2014;

(o)     Survey prepared by Peak Surveyors dated May 31, 2013;

(p)     Geology report prepared by Grover Hollingsworth & Associated dated August 1, 2013; and

(q)     Architectural Plan Agreement dated February 17, 2014.

10.3.   Further Assurances.

The Owner and Palumbo shall each execute and deliver to the other such documents and instruments and take such further actions as may be reasonably necessary or required to give full force and effect to this Agreement.

10.4.   Consultants and other Representatives.

Palumbo shall cooperate with any consultants, architects, engineers and representatives appointed by a Lender or the Owner, from time to time to review and assess the progress of the construction of the Project (including, upon reasonable prior notice, providing unfettered access to the Project) and shall provide such consultants, architects, engineers and representatives with

any information relating to the Project Services reasonably requested by such consultants, architects, engineers or representatives.

      10.5.   Other Activities; Competition.

      The Owner and Palumbo shall each have the right to engage in, or possess an interest in, any other business ventures, activities and investments, independently or with others, similar or dissimilar to the other's business, provided, however, that Palumbo shall not engage in any such business ventures, activities and/or investments that are in conflict or competition with the Project. Except as expressly provided above, neither the Owner nor Palumbo shall have any rights, by virtue of this Agreement or the relationship created by this Agreement, in or to any such business ventures, activities or investments of the other party, or to income or proceeds derived from such ventures, activities or investments and the pursuit of such ventures, activities or investments by the Owner, its partners, Palumbo or their respective Affiliates shall not be deemed wrongful or improper.

      10.6.   Modifications, Approvals and Consents.

      No amendment, modification or waiver of, and no consent or approval with respect to, any provision of this Agreement shall be effective unless in writing executed by the party against whom such amendment, modification, waiver, consent or approval is sought to be enforced, and any such waiver or consent or approval shall be effective only in the specific instance and for the specific purpose given.

      10.7.   Notices.

      All notices, requests or other communications which may be or are required to be given, served or sent by either Palumbo or the Owner to the other shall be in writing and shall be deemed received (a) upon delivery in person, (b) if transmitted by facsimile (with a copy delivered in person or by overnight delivery the next Business Day), upon confirmation of receipt by printed facsimile acknowledgment, (c) by email (with a copy delivered in person or by overnight delivery the next Business Day) after being deposited for overnight delivery with any reputable overnight courier service, or (d) three Business Days after being deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case addressed as follows (or to such other address as either party may specify by notice to the other):

      *To Palumbo:*      Palumbo Design

                             4405 Estrondo Drive
                             Encino, CA 91436
                             Telephone: (310) 963-0915
                             Email: racingmp@aol.com

| | |
|---|---|
| *and* | CA Land Use Professionals, LLP<br>4221 Wilshire Blvd., Suite 170-I<br>Los Angeles, CA 90010<br>Attention: Ellia Thompson<br>Telephone: (323) 931-9686<br>Fax Number: (310) 742-0255<br>Email: Ellia@calandusepros.com |
| *To the Owner:* | 1169 Hillcrest LLC<br>5555 Badura Avenue, Suite 120<br>Las Vegas, NV 89118<br>Attn: Neil Moffitt<br>Telephone: (702) 212-8804<br>Fax Number: (702) 853-4385<br>Email: neil@hkkhospitality.com |
| *and* | Greenberg Traurig LLP<br>3773 Howard Hughes Parkway, Suite 400N<br>Las Vegas, NV 89169<br>Attention: Michael J. Bonner<br>Telephone: (702) 792-3773<br>Fax Number: (702) 792-9002<br>Email: bonnerm@gtlaw.com |

10.8.   Estoppel Certificate.

Palumbo and the Owner shall each, within ten Business Days following a written request of the other from time to time, furnish to the other a written certificate stating (i) that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the Agreement is in full force and effect as modified and stating the modifications), (ii) whether, to the best knowledge of such certifying party, the requesting party is in material default in the observance or performance of its agreements or obligations under this Agreement and, in the event of any such default, specifying the nature of each such default, and (iii) to the best of the knowledge and belief of the certifying party, any other matters reasonably requested by the requesting party. The requesting party and any other Person for which such certificate is requested may rely on such certificate, but no such certificate shall operate as a waiver of any default or other matter as to which the party executing it did not have actual knowledge.

10.9.   Consent to Jurisdiction.

Any dispute related hereto shall be filed in state or federal court located in Los Angeles County, California, and said courts shall be the exclusive jurisdiction for any such dispute. All parties consent to the jurisdiction of the state and federal court of California.

[Remainder of Page Intentionally Left Blank]

Palumbo and the Owner execute this Agreement as of the date first set forth above.

**OWNER:**

**1169 HILLCREST LLC,** a Nevada limited
liability company

Date: _____

By: _____
Name:
Title

**PALUMBO:**

**PALUMBO DESIGN,** LLC, a California
limited liability company

Date: _____

By: _____
    Michael Palumbo, Manager

**SCHEDULE 1.1(i)**

**Form of Budget**

**SCHEDULE 1.1(l)**

**Conceptual Budget and Schedule**

## SCHEDULE 5.1

### Development Services Fee

1.      Commencing 30 days after Owner's purchase of the Property, the Owner shall pay a monthly draw in the amount of $15,000.00 per month to Palumbo (the **"Monthly Draw"**).  The Monthly Draw shall continue until the cumulative Monthly Draws equal seven percent (7%) of the construction cost of the Project or until the sale of the Project and/or Property, whichever shall first occur.  All Monthly Draws will be an advance of the aggregate development fee (the **"Aggregate Development Fee"**).

2.      The Aggregate Development Fee shall be calculated as follows:

The Sales Price of the Project and/or Property

Less real estate broker Commission

Less out-of-pocket costs of sale of the Project and/or Property incurred by Owner

Less all cash payments made by the Owner to purchase, develop and construct the Project and/or Property (the **"Owner Payments"**)

Less a preferential return of 10% on all Owner Payments

Less all payments of principal and interest in the event that Owner determines to obtain financing for the purchase, development and construction of the Project and/or Property, including all costs incurred by Owner in connection with obtaining such financing(s).

Equals Net Profits on Sale of the Project and/or Property.

The Aggregate Development Fee shall be 40% of the Net Profits on Sale of the Project and/or Property.

The amount to be paid to Palumbo upon the sale of the Project and/or Property shall be:

The Aggregate Development Fee less the aggregate of all Monthly Draws upon the sale of the Project and/or Property.

**SCHEDULE 10.2**

**Assignment and Assumption Agreement**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT**(this **"Assignment"**) is made as of this _____ day of March, 2014, by and between Mike Palumbo (**"Assignor"**), with a mailing address of 4405 Estondo Drive, Encino, CA 91436 and 1169 North Hillcrest, LLC, a Nevada limited liability company (**"Assignee"**), with a mailing address of 5555 Badura Avenue, Suite 120, Las Vegas, Nevada 89118.

### RECITALS

A.   Assignor, as buyer, entered into that certain Residential Purchase Agreement and Joint Escrow Instructions (the **"Agreement"**), dated February 4, 2014, for the purchase and sale of the real estate commonly known as 1169 Hillcrest Road, Beverly Hills, CA 90210 (the **"Property"**).

B.   Palumbo Design, LLC, a California limited liability company and Assignee are parties to that certain Development Services Agreement with respect to the Property dated of even date herewith (the **"Development Services Agreement"**).

C.   Pursuant to the Development Services Agreement, Assignor is required to assign to Assignee the Agreement and related documents as set forth in Schedule 1 attached hereto and made a part hereof (such documents together with the Agreement, the **"Property Documents"**).

D.   All capitalized terms used in this Assignment without separate definition shall have the same meanings assigned to them in the Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the recitals set forth above, which are made a part of this Assignment, the mutual covenants hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Assignment.   Assignor hereby assigns, conveys, transfers, and sets over unto Assignee all of Assignor's right, title, and interest in the Property Documents, free and clear of any encumbrance, claim, lien, or charge of any kind, to have and to hold the same unto Assignee, its successors and assigns.

2.   Assumption.   From and after the date hereof, Assignee assumes all of Assignor's obligations under the Agreement first arising and relating to the period on or after the date hereof.

3.   Binding Effect.   This Assignment shall be binding upon and inure to the benefit of the Assignor and Assignee and each of their respective successors and assigns.

4.   Counterparts.   This Assignment may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

5.    Governing Law.  This Assignment shall be governed by, interpreted under and construed and enforceable in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the day and year first above written.

**ASSIGNOR:**

_____

Michael Palumbo

**ASSIGNEE:**

1169 Hillcrest, LLC, a Nevada limited liability company

By: _____

Name: _____

Title: _____

## SCHEDULE 1

    (a)    Statewide Buyer and Seller Advisory dated February 17, 2014;

    (b)    Disclosure Regarding Real Estate Agency Relationship dated February 4, 2014;

    (c)    Seller Vacant Land Questionnaire dated February 17, 2014;

    (d)    Residential Earthquake Hazards Report dated February 18, 2014;

    (e)    Lead-based Paint and Lead-based Paint Hazards Disclosure, Acknowledgment and Addendum dated February 4, 2014;

    (f)    Carbon Monoxide Detection Notice dated February 18, 2014;

    (g)    Market Conditions Advisory dated February 17, 2014;

    (h)    Disclosure Addendum dated February 22, 2014;

    (i)    Disclosure and Consent for Representation of More than One Buyer or Seller dated February 4, 2014;

    (j)    Buyer Inspection Waiver dated February 22, 2014;

    (k)    Agent Visual Inspection Disclosure dated February 20, 2014;

    (l)    Preliminary Title Report prepared by American Title;

    (m)    Escrow Instructions dated February 19, 2014 as amended February 20, 2014;

    (n)    Survey prepared by Peak Surveyors dated May 31, 2013;

    (o)    Geology report prepared by Grover Hollingsworth & Associated dated August 1, 2013; and

    (p)    Architectural Plan Agreement dated February 17, 2014.

# EXHIBIT 2



February 22, 2019

*Via Email and Federal Express*

1169 Hillcrest LLC
5555 Badura Avenue, Suite 120
Las Vegas, NV 89118
Attn: Neil Moffitt
*neil@hkkhospitality.com*

Greenberg Traurig LLP
3773 Howard Hughes Parkway, Suite 400N
Las Vegas, NV 89169
Attention: Michael J. Bonner
*bonnerm@gtlaw.com*

**Re:     Notice of Termination and Notice of Terminating Event(s) Pursuant to Development Services Agreement Between 1169 Hillcrest, LLC and Palumbo Design, LLC**

This notice by Palumbo Design, LLC ("Palumbo Design") shall constitute written notice as provided for by Sections 8 and 10.7 of the Design Services Agreement ("DSA") that Palumbo Design claims that 1169 Hillcrest, LLC's ("Owner") sale of the Property located at 1169 Hillcrest Road, and Owner's written termination of Palumbo Design are each a Termination Event under Section 8.1 of the DSA.

THIS NOTICE SHALL CONSTITUTE NOTICE OF OUR (PALUMBO DESIGN, LLC) DETERMINATION THAT A "TERMINATION EVENT" HAS OCCURRED UNDER THE DEVELOPMENT SERVICES AGREEMENT DATED AS OF MARCH ___, 2014 AMONG THE OWNER ("1169 HILLCREST, LLC) AND PALUMBO (PALUMBO DESIGN, LLC). IF YOU DISPUTE WHETHER A TERMINATION EVENT HAS OCCURRED, YOU MUST SUBMIT SUCH DISPUTE TO "ARBITRATION" IN ACCORDANCE WITH THE TERMS OF SAID DEVELOPMENT SERVICES AGREEMENT WITHIN SEVEN DAYS OF RECEIPT OF THIS WRITTEN NOTICE. YOUR FAILURE TO SUBMIT SUCH DISPUTE TO ARBITRATION WITHIN SUCH SEVEN-DAY PERIOD SHALL CONSTITUTE AN IRREVOCABLE, BINDING ADMISSION BY YOU THAT A TERMINATION EVENT HAS OCCURRED.

Palumbo Design, LLC

By _____
    Its Manager

**From:** Michael Palumbo <michael@palumbodesign.com>
**Sent:** Thursday, March 21, 2019 9:53 AM
**To:** neilmoffitt@gmail.com; Neil Moffitt <neil@hakkasan.com>
**Subject:** Notice of termination

To Neil Moffit:
See attached


Michael Palumbo
(310)963-0915
www.palumbodesign.com

**From:** Michael Palumbo <michael@palumbodesign.com>
**Sent:** Saturday, February 23, 2019 12:01 AM
**To:** bonnerm@gtlaw.com
**Cc:** Laurence Berman <lberman@bermanlitigationgroup.com>
**Subject:** Termination Notice Letter.pdf

To Michael J Bonner
From Michael Palumbo


Michael Palumbo
(310)963-0915
www.palumbodesign.com

EXHIBIT 3

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made as of December **18** , 2015 (the "Effective Date"), by and between Palumbo Design, LLC ("Palumbo"), on the one hand, and 1169 Hillcrest, LLC, NAM2 LLC, and Neil Moffitt (together, "Moffitt") on the other hand. Palumbo and Moffitt are hereafter referred to individually as a "Party" to the Agreement, or collectively as the "Parties" to the Agreement.

### RECITALS

WHEREAS, on or about March 3, 2015, Palumbo filed an action against Moffitt, in the United States District Court for the Central District of California, styled *Palumbo Design LLC v. 1169 Hillcrest, LLC et al.*, Case No. 2:15-cv-01899-DSF (VBKx) (the "Palumbo Action");

WHEREAS, Palumbo and Moffitt wish to settle the claims brought in the Palumbo Action, on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including the mutual promises contained in this Agreement:

### AGREEMENT

1.    **Key Terms.**

Palumbo agrees to the execution of an Agreed Order of dismissal with prejudice of the Palumbo Action in exchange for Moffitt's agreement to the following:

(a) For a period of 19 weeks following the operative date of this Agreement (the "Marketing Period"), Moffitt will not enter into any settlement agreement with Skyview Capital, LLC ("Skyview") or its member Alex Soltani in connection with an action filed by Skyview on or about March 27, 2015, in the United States District Court for the Central District of California, styled *Skyview Capital LLC v. 1169 Hillcrest, LLC et al.*, Case No. 2:15-cv-02321-DSF-VBK (the "Skyview Action"). This shall include, but is not limited to, forbearance by Moffitt from acting on any agreement wherein Moffitt agrees to sell to Skyview or Soltani real property located at 1169 N. Hillcrest Road, Beverly Hills, California 90210 (the "Property");

(b) During the Marketing Period, Moffitt agrees to list the Property on the open market, including, but not limited to, placing it on the Multiple Listing Service, with the goal of achieving a sale of the Property for optimal market value.

(c) During the Marketing Period, Palumbo will have full control of and decision-making authority over marketing activities, including, but not limited to, choosing realtors and executing listing agreements with agents at a 4 to 4.5% commission. However, if Moffitt or his counsel have a legitimate conflict with Palumbo's selection, they reserve the right to refuse a listing. However, Moffitt or his counsel

will not refuse any selection by Palumbo identified on an advance list provided in connection with this agreement. Palumbo will be present at all showings to describe and explain design concepts and the plans designed and drawn by the architect, in collaboration with Palumbo. Palumbo and Moffitt will discuss, through counsel, and agree upon any counteroffers before made to potential buyers. Moffitt agrees to act in good faith and in a timely fashion in considering and responding to offers.

(d) If Palumbo agrees to pay for an application for permits for the Property, that payment will be added to the costs-basis for the Property. That amount includes fees for consultants necessary to expedite the submittal process. Palumbo shall be reimbursed from any sales proceeds the application fees. Moffitt is not opposed to any reasonable proposal for contribution for fees.

(e) Within one month after the operative date of this Agreement, counsel for Moffitt, the assistance of Palumbo' counsel, will file a motion to expunge the lis pendens recorded by Skyview on the Property, to be heard within three months of the operative date of this Agreement or as soon as the arbitrator shall schedule. Moffitt shall contribute and pay for all necessary legal fees, expert witness fees, and other fact witnesses to win the motion.

(f) If, at the end of the Marketing Period, the Property is not in escrow for sale to a third party and/or the Skyview Action and lis pendens are still in effect, then Moffitt agrees that Palumbo (or a limited liability company to which he/it is a member) will have an option to purchase the Property for a sale price of $22,824,915.99. If Palumbo exercises the option, Palumbo will take the Property subject to any lis pendens or claims made on the Property at that time by Skyview and/or Soltani.

(g) Immediately upon execution of this agreement, counsel for Plaintiff in *Palumbo Design LLC v. 1169 Hillcrest, LLC et al.*, Case No. 2:15-cv-01899-DSF (VBKx) is to execute a stipulation and order to dismiss the case with prejudice, each party to bear its own costs and fees.

(h) Palumbo agrees to release Moffitt for any and all claims arising out of the allegations set forth in the acition entitled *Palumbo Design LLC v. 1169 Hillcrest, LLC et al.*, Case No. 2:15-cv-01899-DSF (VBKx). This release to does not effect any new conduct that would constitute a breach of the DSA after the execution of this Agreement.

## 2.  Development Services Agreement and Fee

(a) By and through this Agreement, the Parties acknowledge the validity and enforceability of the "Development Services Agreement" (the "DSA") executed by and between Palumbo Design LLC and 1169 Hillcrest LLC in or around March of 2014.

(b) The Parties further acknowledge that Palumbo is entitled to a "Development Services Fee", as defined in Schedule 5.1 of the DSA, upon sale of the Property by 1169 Hillcrest, LLC to any other party, including Palumbo.

(c) The Parties agree that an action to resolve any prospective dispute over the meaning and interpretation of the DSA is not barred by this Agreement. The Parties expressly incorporate by reference herein the venue and choice-of-law provisions of the DSA.

### 3.    No Admission of Liability.

This Agreement is entered into for purposes of settlement and compromise only, and each Party hereby expressly acknowledges and agrees that the other Parties hereto have not admitted, and by execution or performance of this Agreement do not admit, any liability or obligation to the other Parties, except for the obligations created by this Agreement. Nothing contained in this Agreement shall be construed as such an admission by any Party, and the Agreement and its terms are entitled to all applicable evidentiary privileges concerning settlement discussions and offers of compromise.

### 4.    Entire Agreement.

With the exception of the DSA, this Agreement comprises and contains the entire agreement between the Parties respecting the matters set forth in this Agreement, and supersedes and replaces all prior negotiations, understandings, proposed agreements and agreements between the Parties, written or oral.

### 5.    Miscellaneous.

(a)    The waiver of either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any other subsequent breach.

(b)    The provisions of this Agreement shall not be construed against the Party responsible for drafting the Agreement.

(c)    All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, each of the Parties hereto, their respective legal representatives, heirs and, as permitted hereunder, assigns. Nothing in this Agreement is intended to or shall be construed to grant or confer upon any person, other than the parties hereto and their respective successors and assigns, as permitted, any rights or remedies under or by reason of this Agreement.

(d)    If any provision of this Agreement is determined to be unenforceable, such determination shall not affect the remaining provisions of this Agreement, all of which shall remain in full force and effect, and shall be enforceable without regard thereto.

(e)     This Agreement may be executed and delivered by facsimile and, upon such delivery, the facsimile will be deemed to have the same effect as if the original signature had been delivered by the other party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above:

1169 Hillcrest LLC, NAM2 LLC and Neil Moffitt

By: _____
                    Neil Moffitt

Palumbo Design LLC

By: *Michael Palumbo*
    FBF6752433AA4AD...        Michael Palumbo